# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 3083 | **DATE** | 11/14/2000 |
| **CASE TITLE** | Tejack vs. Quality Terminal Services | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons set forth on the attached order, the Court denies defendant's motion for summary judgment (23-1). Defendant's oral motion to bifurcate is denied as moot, as defendant has withdrawn that request.

(11) ■ [For further detail see order attached to the original minute order.]

| ✓ | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | NOV 15 2000 date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | 32 |
| | Copy to judge/magistrate judge. | | | |
| OR | courtroom deputy's initials | FILED FOR DOCKETING 00 NOV 14 PM 4: 21 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DENNIS TEJACK, | ) |
|       Plaintiff, | ) |
| vs. | ) Case No. 99 C 3083 |
| QUALITY TERMINAL SERVICES, LLC, | ) |
|       Defendant. | ) |

DOCKETED
NOV 1 5 2000

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

In this action, which was removed from state court based on diversity jurisdiction, Dennis Tejack claims that he was fired by Quality Terminal Services, LLC in April 1998 in retaliation for making complaints about safety and exercising his rights under Illinois' worker's compensation law. QTS has moved for entry of summary judgment.

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only if there are no genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is genuine if a reasonable trier of fact could find in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In assessing whether summary judgment is appropriate, we are required to view the facts in the light most favorable to Tejack, the non-moving party, drawing reasonable inferences in his favor. *Celotex*, 477 U.S. at 322. For the reasons that follow, the Court denies QTS's motion.

### Facts

QTS has a contract with Burlington Northern Santa Fe Railroad to transload trailers to

and from railcars at BNSF's Cicero, Illinois yard. In September 1997, the company hired Tejack as a spotter – a truck driver who drives inbound loads brought into the yard and parks or "spots" them beside trains so they can be loaded, and vice versa. Tejack was hired by QTS Terminal Manager Michael Sak after a meeting between Sak, Tejack, and a representative of the Occupational Safety and Health Administration that took place after Tejack complained to OSHA about not being hired by QTS. Before he was hired by QTS, Tejack had worked for Pacific Rail, which had preceded QTS in its role as subcontractor to BNSF, but had resigned his employment over safety concerns.

A. **Facts relating to claim of retaliation for safety complaints**

During his eight-month employment with QTS, Tejack regularly raised safety issues to QTS supervisors involving equipment employees were using and the general condition of the premises. On several occasions, Tejack wrote letters directly to BNSF's management expressing safety concerns. Sak felt that Tejack was out of line in communicating with BNSF and in late January 1998 instructed Tejack that he needed to follow the chain of command within QTS in voicing safety complaints. In early March, Sak received a letter from a BNSF official who said that he had received two letters from Tejack expressing safety concerns. After receiving this letter, Sak again spoke with Tejack and told him that he would be fired if he wrote another complaint letter to BNSF. Tejack offers no evidence that he wrote any further letters to BNSF or that he complained to BNSF management after this.[1]

---

[1] In an affidavit submitted in opposition to summary judgment, Tejack says that on April 3, 1998, he verbally complained to a QTS safetyman and a BNSF foreman about a "chassis with bad legs which had a 54,000 pound container on it." Tejack Aff. ¶H(6). Tejack offers no evidence, however, that Sak or anyone else with QTS management ever learned of this.

2

On April 4, 1998, Tejack was involved in a collision with another QTS driver in the yard; the other vehicle struck Tejack's vehicle from behind at a speed of about ten miles per hour. After the accident, Sak spoke to both Tejack and the other driver as well as other witnesses. Tejack believed that the other driver had been drinking, and he asked Sak to perform alcohol and/or drug tests on both of them. Sak replied that the accident was not serious enough to warrant testing and that he felt that the accident had been Tejack's fault. He directed Tejack to return to work. An argument ensued; Tejack yelled at Sak (for an extended period, Sak says) and said that Sak's refusal to require drug / alcohol testing was "bullshit." Sak also raised his voice and, according to Tejack, also used profanity. Tejack refused to return to work, saying that he believed the other driver had been drinking, and he did not feel safe working with him. Sak says he told Tejack that his choices were to return to work or resign; according to Tejack, Sak said nothing about resigning but rather said only that if Tejack did not feel safe, he should punch out and go home. Tejack left the yard and did not return to work. Five days later, Sak sent Tejack a letter stating that he had been terminated for gross insubordination.

**B.    Facts relating to claim of retaliation for exercising worker's compensation rights**

Tejack was injured at work on March 18, 1998. He sent Sak a letter on March 19, 1998 asking to be paid for his time off work and including a note from his doctor saying that he was restricted to light duty. In late March, Tejack completed a questionnaire for QTS's worker's compensation insurance carrier in connection with his injuries. On March 24, the insurer sent QTS a notice of Dennis' worker's compensation claim.

Around April 1, 1998, Tejack gave Sak an unpaid medical bill related to an on-the-job injury that Tejack had sustained in September 1997. He told Sak that the bill had not been paid

3

and asked his assistance in getting QTS to pay it.

Tejack says that after the April 4, 1989 accident, he asked Sak for permission to go to the hospital, telling Sak that he had hit his head on the rear window of his truck and had a knot on his head. Sak refused this request. Tejack completed a QTS incident report describing the accident. In the report, he indicated that there had been an on-the-job injury which he described as a "headache" and said that medical expenses were "unknown."

## Discussion

### A. Retaliation for safety complaints

The tort of retaliatory discharge, as construed by Illinois courts, protects workers from the traditional rule of at-will employment in limited and narrow circumstances by allowing an terminated employee to recover damages for a discharge that contravenes a clearly mandated public policy. *E.g., Palmateer v. International Harvester Co.*, 85 Ill. 2d 124, 130-31, 421 N.E.2d 876, 878-79 (1981); *Barr v. Kelso-Burnett Co.*, 106 Ill. 2d 520, 525, 478 N.E.2d 1354, 1356 (1985). To prevail, the plaintiff must show that he was: (1) discharged, (2) in retaliation for his activities, and (3) that the discharge contravened a clearly mandated public policy established by state or federal law. *See, e.g., Hartlein v. Illinois Power Co.*, 151 Ill. 2d 142, 160, 601 N.E.2d 720, 728 (1992); *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 505, 568 N.E.2d 870, 875 (1991).

The requirement of proof of retaliation is not met if the employer has a valid, non-pretextual basis for discharging the employee. *E.g., Hartlein*, 151 Ill. 2d at 160, 601 N.E.2d at 728. In federal court, retaliatory discharge actions are analyzed under the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See McEwen v. Delta Air Lines, Inc.*, 919 F.2d 58, 59-60 (7th Cir. 1990). Under this method, if the employer

proffers a non-retaliatory reason for the termination, the burden shifts to the employee to prove by a preponderance of the evidence that the reason was a pretext for unlawful retaliation. An employee can establish pretext by showing that the employer's explanation is unworthy of credence or that the decision to terminate was more likely than not motivated by retaliatory reasons. *See Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 256 (1981); *Horton v. Miller Chemical Co.,* 776 F.2d 1351, 1359 n.11 (7th Cir. 1985).

The causation element is where QTS trains its guns, so that is where we will focus as well. Tejack's termination came immediately after his refusal to work with his allegedly intoxicated co-worker. "A showing that the adverse employment action occurred on the heels of the protected activity is indirect evidence of retaliation." *Scott v. Sunrise Healthcare Corp.,* 195 F.3d 938, 941 (7th Cir. 1999). Though it may not be enough by itself to get past a summary judgment motion or a motion for judgment as a matter of law under Rule 50, *see Bermudez v. TRC Holdings, Inc.,* 138 F.3d 1176, 1179 (7th Cir. 1998); *Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 321 (7th Cir. 1992), here Tejack has more.

Specifically, Tejack has evidence from which a jury could infer that QTS's stated reason for discharging him was pretextual. A plaintiff can prove pretext indirectly, by showing (among other things) that the employer's stated reason was not the "real reason" it acted as it did. *See, e.g., Baron v. City of Highland Park,* 195 F.3d 333, 341 (7th Cir. 1999). QTS claims that Sak fired Tejack for insubordination and failing to return to work. Insubordination is a legitimate reason for an employer to take action against an employee, but simply claiming insubordination does not insulate the employer's rationale from scrutiny. Tejack has sufficiently challenged the veracity of Sak's explanation so as to require a jury to decide the issue. First, Tejack and Sak

5

have differing versions of their encounter on April 4. Sak says he directed Tejack to return to work or be fired; Tejack says Sak told him that if he did not feel safe, he should go home, but that Sak made no threat of termination. If Tejack is right, a jury could conclude that reliance on his failure to return to work was a trumped-up reason for QTS's action. Second, in his termination letter Sak said that Tejack "yelled and cursed at [him] personally," but at his deposition he said that Tejack's use of the word "bullshit" was directed not at him personally, but at the procedures he had chosen to follow. In view of Sak's reliance on a claim of insubordination, the veracity of his account of the encounter is material, and it is genuinely in issue; we are not permitted to choose between differing versions of the same events in deciding a motion for summary judgment. In addition, though it is undisputed that Tejack told Sak, a superior and the chief supervisor of the yard for QTS, that what he had decided was "bullshit," there is evidence from which a jury could infer that other QTS employees who acted insubordinately were not terminated but rather were given warnings and reprimands by management, including by Sak himself (excepting some instances in which there had been a prior history of insubordination). *See generally Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1042 (7th Cir. 1993) (evidence that employer dealt more leniently with similar conduct of similarly situated employees outside protected class can serve as evidence of pretext). We draw this evidence not from Tejack's requests for admission or QTS's responses – for the responses largely consist of objections to the requests – but rather from the QTS documents that Tejack attached to the requests. Because these are documents that Tejack obtained from QTS in discovery, we have little doubt that he will be able to authenticate them at trial (assuming QTS chooses to challenge the authenticity of its own records).

This, together with the timing of Tejack's discharge, is evidence from which a jury could conclude that QTS actually terminated Tejack because he was unwilling to work in an area where another employee whom he believed was intoxicated was operating heavy equipment, and that its reliance on insubordination was pretextual. "A jury can (though it need not) infer improper motive from pretext." *Kasper v. St. Mary of Nazareth Hospital,* 135 F.3d 1170, 1173 (7th Cir. 1998). *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511 & n.4 (1993).

There is certainly evidence from which one could conclude that Tejack is not telling the truth about his encounter with Sak. Among other things, Tejack told another employee after getting his termination letter that he had been fired as a result of his altercation with Sak and because Sak had blamed him for the accident. Though Tejack presumably is not a mind-reader, the statement is evidence of his own state of mind and thus may bear on the veracity of his account of the meeting with Sak. In addition, QTS has submitted evidence indicating that Tejack may have made false statements under oath to the Social Security Administration in January and April 1998 in order to qualify for disability benefits. If so, this too may bear on Tejack's credibility. *See* Fed. R. Evid. 608(b). But determination of whether Sak or Tejack is telling the truth is a role assigned to the jury, not to this Court.

Finally, we briefly address the "public policy" element of Tejack's claim. Most retaliatory discharge cases involve what is generally referred to as "whistle blowing," i.e., reporting some unsafe or illegal activity to management or some outside agency. *See Sherman v. Kraft General Foods, Inc.,* 272 Ill. App. 3d 833, 838, 651 N.E.2d 708, 711 (1995). In this case, it seems clear from both sides' versions of the evidence that Tejack was not discharged for *reporting* the accident or his co-worker's alleged condition; Tejack's claim seems to be that the discharge

7

resulted from his refusal to return to work. The Illinois Supreme Court has held, however, that an employee may maintain a retaliatory discharge claim when he is terminated for refusing to work under conditions that contravene a clearly mandated public policy. *See Wheeler v. Caterpillar Tractor Co.,* 108 Ill. 2d 502, 509-11, 485 N.E.2d 372, 376-77 (1985). If Tejack's co-worker was driving a truck while intoxicated, he was acting in violation of Illinois statute, namely the prohibition on driving while under the influence of alcohol. *See* 625 ILCS 5/10-501 (making it a crime to drive a motor vehicle while intoxicated); *People v. Kissel,* 150 Ill. App. 3d 283, 286, 501 N.E.2d 963, 964 (1986) (DUI statute applies to driver of any vehicle, even if entirely on private property). In *Wheeler,* however, the public policy that was allegedly violated by the employee's discharge came from a safety regulation that imposed an obligation on the employer. That is not the case with regard to the DUI statute, which may have prohibited the co-worker's alleged conduct but which imposed no obligations or duties on QTS.[2] The distinction between an obligation or prohibition imposed upon the employer and one imposed upon others may be significant for purposes of the "public policy" inquiry. *See Barr v. Kelso-Burnett,* 106 Ill. 2d 520, 526, 478 N.E.2d 1354, 1356 (1985) (employer's alleged violation of free speech does not constitute contravention of public policy, for constitutional free speech clause imposes prohibitions only on governmental entities). But QTS has not argued the public policy point, so we will not decide the issue here.

QTS objects that the only support for Tejack's claim that the co-worker was intoxicated is

---

[2] Tejack might be claiming that the public policy that was violated was an obligation imposed by QTS by some law or regulation to provide an alcohol-free workplace, or at least a safe one, but he has made no effort to identify any such provisions.

8

his own "self-serving" testimony, suggesting that this is not enough. We disagree. If Tejack observed the co-worker as he claims, he is just as competent as any other eyewitness to testify about the co-worker's appearance and behavior. There is no requirement that the employee provide corroboration for his own testimony in order to survive summary judgment. *See Lemieux v. Consolidated Freightways, Inc.*, No. 97 C 5606, 1997 WL 652313, at *3 (N.D. Ill. Oct. 15, 1997) (dealing with this issue in the context of a motion to dismiss). If the jury believes Tejack's testimony, it could conclude that he had a good faith basis for his contention that the co-worker was intoxicated. It might be argued that this effectively entitles *any* fired employee to a trial if he is able to concoct a safety complaint based on his own unsupported testimony. Not so. In this case, it is undisputed that a collision between the co-worker's truck and Tejack's occurred, and it is likewise undisputed that Tejack made a contemporaneous complaint about his co-worker's condition. What is disputed is whether the co-worker was intoxicated, a matter which generally speaking is within the ken of an ordinary observer (absent an objective test – as Tejack says he requested Sak to perform). Thus, the fact that Tejack's testimony is enough to preclude summary judgment is a function of the nature of the particular alleged safety violation that he reported; it does not mean that the employee's bare testimony will suffice in every retaliatory discharge case.

**B.      Retaliation for exercise of worker's compensation rights**

Under the law of retaliatory discharge, an employee terminated for exercising his rights under Illinois' worker's compensation laws may maintain a claim against his employer. *See, e.g., Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 384 N.E.2d 353 (1978). QTS argues primarily that Tejack cannot maintain such a claim because he never actually filed a claim for worker's compensation benefits with the Illinois Industrial Commission. However, as the law has

9

developed since *Kelsay*, filing of a formal claim for benefits is not a prerequisite to recovery. An employee's attempt to collect benefits from the employer's worker's compensation insurance carrier suffices as an exercise of protected rights. *Brudne v. Amalgamated Trust & Savings Bank*, 627 F. Supp. 458, 465 (N.D. Ill. 1985). So does merely informing management of an injury and requesting medical attention constitutes protected activity, particularly when, as in this case, the employee has pursued payment of medical bills in connection with earlier work-related injuries, making it reasonable to assume that he will do likewise in connection with his latest accident. *Hinthorn v. Roland's of Bloomington, Inc.*, 119 Ill.2d 526, 533-34, 519 N.E.2d 909, 913 (1988).

The same evidence that gives rise to a jury question regarding whether he was discharged for his safety-related complaint – a genuine issue regarding whether QTS's stated reason was a pretext, plus the timing of the discharge – is likewise evidence from which a jury could conclude that he was discharged in retaliation for his exercise of rights protected under the worker's compensation laws. Indeed, the evidence would permit (though not require) a jury to find that Tejack was discharged because of a combination of his safety-related complaints and the fact that he had made and was expected to make claims for worker's compensation benefits.

C.   **Issue of "judicial estoppel"**

QTS argues that because Tejack made a claim to the Social Security Administration for disability benefits based on his asserted inability to work as of January 1998, he should be estopped from pursuing a claim of retaliatory discharge. To support this argument, QTS relies on *Wilson v. Chrysler Corp.*, 172 F.3d 500 (7th Cir. 1999) and *DiGiuseppe v. Village of Bellwood*, 68 F.3d 187 (7th Cir. 1995). In *Wilson*, a Title VII case, the plaintiff claimed she had been sexually harassed during her employment and that the defendant had retaliated against her for

complaining about the harassment. She had taken a medical leave of absence from Chrysler based on a diagnosis of severe fatigue syndrome. Several months later, her doctor concluded that she was able to return to work; however, two Chrysler doctors opined that she suffered from paranoid schizophrenia and was not fit for reinstatement. Chrysler said it had declined to allow plaintiff to return to work based on the conclusions of the Chrysler doctors; plaintiff claimed this was a pretext for retaliation. However, during her leave of absence, plaintiff had applied for Social Security disability benefits; she ultimately received such benefits and also secured a disability pension from Chrysler in reliance on the Chrysler doctors' report. Based on this record, the Seventh Circuit concluded that the plaintiff was estopped from claiming that she was able to return to work and thus could not refute Chrysler's stated reason for its actions. *Id.* at 504.

In *DiGiuseppe,* the plaintiff, a police officer who had undergone surgery, requested assignment to light duty. The chief of police refused the request and told plaintiff that he would have to take sick leave. He ultimately told plaintiff that if he could not return to work, involuntary discharge proceedings would be commenced, and he encouraged plaintiff to apply for a disability pension. Plaintiff eventually applied for such a pension, claiming that he was not capable of returning to work. In his lawsuit, he claimed that the chief's actions constituted retaliation for his opposition to the chief's appointment. The court concluded, however, that plaintiff had ended his police career of his own volition by claiming to the pension board that he was disabled. Because plaintiff had taken that position in a prior proceeding, the court held that he was estopped from taking the opposite position in his federal lawsuit. *Id.* at 191.

Neither *Wilson* nor *DiGiuseppe* bars Tejack's claim outright. In each case the plaintiff's claim for disability benefits directly contradicted one of the essential elements of the plaintiff's

11

federal claim – in *Wilson,* the plaintiff's need to show that the employer's justification for its action was false; in *DiGiuseppe,* the plaintiff's need to show that he lost his job as a result of the defendant's conduct. The same is not true here; the fact that Tejack made a disability claim does not undercut any part of his claim that QTS is liable for discharging him in retaliation for his activities and that the discharge violates public policy. Moreover, unlike in *Wilson,* there is no indication that QTS had any idea that Tejack had made a disability claim of that the fact that he had made such a claim had any bearing on the company's decision making.

On the other hand, there may be an inconsistency between Tejack's disability claim and his claim here for back pay that under *DiGiuseppe* might limit his recovery of this element of damages. Put another way, Tejack's claim to Social Security that he was unable to work would appear to be inconsistent with the basic premise of a claim for back pay – that the employer's actions deprived the employee of wages that he otherwise would have received because he would have been working. *See generally Flowers v. Komatsu Mining Systems, Inc.,* 165 F.3d 554, 557 (7th Cir. 1999) (wrongfully discharged employee not entitled to back pay during period he was unable to work).[3] The extent to which this affects Tejack's damages claim will depend on the particulars of the disability claim: it is unclear how long Tejack was on disability, and there is some suggestion that Social Security may have recouped some of the payments it made to him.[4] In addition, as indicated earlier QTS may be entitled to introduce the disability claim with respect

---

[3] *Flowers* also holds that a court may, but need not, offset a plaintiff's disability benefits against any back pay award. 165 F.3d at 558. That is a separate issue which may also affect any recovery of damages by Tejack.

[4] This issue should be determined prior to trial, so it is important for the parties to determine to the extent possible the particulars of the disability benefits that Tejack received.

12

to Tejack's credibility. *See* Fed. R. Evid. 608(b). The fact that he made a disability claim, however, does not estop Tejack from pursuing his lawsuit.

## Conclusion

For the foregoing reasons, the Court denies defendant's motion for summary judgment [Docket Item 23-1]. Defendant's oral motion to bifurcate is denied as moot, as defendant has withdrawn that request.

                                                                         _____
                                                                         MATTHEW F. KENNELLY
                                                                         United States District Judge

Date:   November 13, 2000